Good morning, Your Honor. This case is under Doctrine 2-13-1305. The people of the state of Illinois, the county of Appalachia, in Lewis v. Gulley, defendant Appellant. Arguing on behalf of the defendant Appellant are Mr. Steven E. Cooper. Arguing on behalf of the county of Appalachia, attorney Mr. Sally A. Swift. Good morning. Mr. Whitman, please, sir. Good morning, Your Honor. Steven Wiltsch on behalf of Mr. Gulley. How do you pronounce your last name? Wiltsch. Wiltsch. That's correct. My brief, Your Honor, raises three issues, and I anticipate today, subject to any questioning, of course, we'll be only discussing the first one. And that would be the application of Rule 402-F to fix this case. Rule 402-F from the Supreme Court, Your Honor, facilitates the interest in dispensing with criminal cases without a full-blown trial. And it does that by ensuring that if parties engage in plea-related discussions, that's not going to come back to haunt them. The rule does not now nor has it ever required that the discussion take place between a suspect and a prosecuting authority. But in this case, was this a plea discussion? That's the issue. Yes, I'm getting to that because, if you will recall the facts, and I'll key in on just a couple of things. My client said to Detective Berg, if you give me a cigarette, I'll tell you everything you need to know about the robbery. After the cigarette, he said, I want you to bring the state's attorney here because I'm going to need a deal. And Detective Berg said, no, that's not going to happen. And then he repeated that request. And the interrogation came to a close. Did he give a concession in exchange for his plea of guilty or in exchange for a deal? Were there any concessions? Were there any discussions about a plea? No, we didn't get into the weeds of guilty plea and terms of years or the nature of the offense to which he would plead. But what is important, I think, is that the conversation turned from one where the defendant is speaking to an investigatory officer about an offense, to one in which my client says, I don't want to talk to you, Detective Berg. I want to talk to a state's attorney. And I don't want to talk about the offense. I want to talk about a deal. And in the Freeman case, it says that a preamble explicitly demarcating the plea-related discussions is unnecessary. And a remark about, quote, making a deal can't be ignored. In other words, so that, and I'm kind of addressing what my opponent says here, so that the fact that we didn't actually get into the weeds of the plea bargaining process is in large part irrelevant. But doesn't Hill and Freeman say, I'll plead guilty if? Actually, what he said was that he was interested in an institution where he'd be housed. He wanted to go to a federal, he wanted to do his time in a federal institution instead of a state one. But that's one of the terms, though, for him. One of the preconditions, one of the terms is, hey, I want to go to a federal joint, not a state joint. Yeah, that's true. So where is something like that in this case? Well, it's absent. And my position is it's unnecessary. And the reason it's unnecessary is because what did Berg say? He said, look, I'm not going to bring this case to you. We're not talking about this. In other words, he slammed the door on us. And I find it a little peculiar that they should be able to make this argument that, well, we didn't get into, you know, the actual details of a plea bargain because Detective Berg said, we're not going to talk about this. And how could it go any further? But isn't this case more like Rivera and Tennant as opposed to Hill and Freeman? I'm sorry, Your Honor? Isn't this case, your case, the Fetcher case more like people versus Rivera where he wanted guarantees that he wouldn't go to jail? And they found that that was not a plea discussion and they allowed that to come in. Well, it's not like Rivera at all. And permit me to explain. Rivera is actually two conversations separated by 19 hours. I beg your pardon. My brief said it was only seven. It was actually 19. At the conclusion of the first conversation, the suspect in Rivera said, I'll tell you what. I'll give you a confession. But first I want another glass of water. And then the interrogation ceased. The last 19 hours. And then when it resumed, we don't know exactly why there was the interruption, but when it resumed, he said, well, if you can guarantee me I won't go to jail, I'll be willing to discuss the case. He never asked to speak to a state's attorney. He never asked about a deal. What he basically wanted was an opportunity to speak off the record. Well, regardless of who he was speaking to, he was trying to make a deal. Does it matter who they're speaking to as to whether or not they're trying to make a deal, whether it's a state's attorney or the cop? I mean, if he's trying to make a deal with the cop and they're in a full-blown plea negotiation, how is that going to be any different than if it was with a state's attorney? Well, I'm inclined to agree with that because obviously the rule 402F, unlike the federal counterpart, doesn't require that the prosecuting authority be there. Correct. But, I mean, as the trial just remarked in this case, in ruling on the motion, he said something along the lines of the defendant was aware that in order to get the ball rolling, he had to get the prosecutor there, the state's attorney. Well, that's not what the case law said, though. Pardon me? That's not what the case law says, not that the trial judge said. No, but what this goes to is what they refer to in the case law as the accused subjective expectations that he's engaging in plea bargaining. In other words, the defendant is aware of the significance of that. The party that I have to deal with is not the party seated across this table. It's the state's attorney. How could he have had a subjective expectation, though, that he's negotiating a plea if he doesn't ask for any terms or state any terms other than, hey, I'd like to talk, or I'd like to talk to that person. He doesn't even actually offer a plea guilty. He just says, I want to talk to that. It seems so preliminary that it doesn't even get to actually a subjective expectation that he's going to negotiate a plea. Well, he did say in the beginning of the conversation, and I didn't get into it, but what he said was, you know, if I confess to this, I'm looking at going away for the rest of my life because this is a third strike candidate. So, in other words, you can see the wheels are spinning. He's very, very sensitive to the problem of what the consequences of conviction are on this. And what is a guilty plea? Well, a guilty plea is a confession in open court. I think we can't close our eyes to what's going on in his mind as he's speaking. As a matter of fact, Friedman kind of addresses this. The court says that where the defendant's expectations are not really explicit, where he doesn't really spell it out, the circumstances surrounding the statement take precedence in interpreting what his expectations are. If it seemed to me that if the state had their way in this case, if I lose this case, I think any astute prosecutor would tell investigators, look, if the suspect ever says they want to talk to me about making a deal, slam the door on them. Because I can make this statement, I can make that statement as consciousness of guilt because he wants to make a deal. You're giving them a lot of credit. Well, maybe they're slow learners, but don't pick them up on it. But, no, I don't know how Rule 402F can work if this is admissible. Because it seems that before we get to the discussion of, well, are you going to plead guilty to X? And we're typically talking about terms of years. And what are the terms of years? What kind of term are we talking about? Before we even get to that, there's a threshold question is, does anyone want to engage in plea discussions at all? In other words, actually kind of illustrated by this case, because at the suppression hearing, Detective Burke said, well, I told them that we weren't going to get the state's attorney because I thought we had our man. And it may very well be in some cases where the prosecution thinks, well, we've got our guy, and we're just not going to talk about anything at all. But, of course, there's going to be an awful lot of cases where that's not the situation. And the parties subsequently get into some kind of negotiation. But this opening gambit of broaching the topic happens in all kinds of cases. I mean, attorneys say to prosecutors, well, can we negotiate this case? Can we make a deal? Before you run out of time, I want you to address your ineffective assistance claim concerning the jury instruction. And I have one quick question before you get going. How about the fact that the defense attorney really beat home the issue of identification in his closing argument? I mean, he really hit it hard, but he didn't give a jury instruction. Would that jury instruction have made any difference? Well, I really think it does. Because it comes from the judge, and it doesn't come from the attorney. And I think people react to evidence sometimes in kind of a visceral or just kind of a gut way. But when you break it down of what a jury should look at in terms of the value of an identification, they could very well come to a contrary conclusion. In other words, they'll look at the problem of the identification with their head instead of with their heart. And the instruction, since it comes from the court, I think is going to be taken a lot more seriously. This identification, let's face it, is kind of problematic. There's three witnesses here. It's a well-lit gas station and restaurant. There is only one identification, and it's in court. It's not in court. It's out of court. And it's by Jonathan Frisk. And Mr. Frisk says that, look, I really didn't want to look at this guy because, well, there was an armed robbery in progress. He was very scared. He couldn't make a phone call after the offense because he was too nervous. The two other witnesses don't make an identification. In a way, Josh Hayford makes kind of a non-identification because he's shown an array containing the defendant's photograph. And he doesn't identify the defendant as the perpetrator. And under those circumstances, identification is, well, it's less than ideal from the prosecutor's point of view. I mean, it happened to work. And the way they analyze this is kind of in terms of the sufficiency of the evidence. I'm not contending the evidence is insufficient. But in terms of identifications, when you have three witnesses and you only have got one hit, that's kind of problematic. So you're saying notwithstanding the fact that the jury heard, in a sense, the application of these factors, both in cross-examination and during the argument, that it makes a difference whether or not they're actually instructed on it. The point is it's because it comes from the court. Because it comes from the court. The obligation to consider these is not defense counsel's argument. It's the court's direct. I recall, if I can digress, it goes back 20 years. I was in Germany in October of 95. You were where? I was in Germany. And it was just after the O.J. Simpson acquittal came in. And, of course, it was extremely controversial. And I was at dinner with some German lawyers. And this one lawyer turned to me and he said he was very interested in the American criminal justice system. And he says, how can you people give this decision to these lay people? And he said it was barbaric. This is just barbaric. Barbaric. And he was friendly about it and wasn't in my face about it. And I said, well, you know, they do get these instructions, you know. And I thought that was going to save the day. But it wasn't cutting it. It wasn't making it. It may not save the day. It didn't save the day. No, I'm not buying that. That wasn't cutting it. But my point is that instructions are really, really important. Because otherwise you have these people where they're kind of at large. And they're making decisions that might not conform to the law or what we think the law should be. So, in other words, I guess it's the opposite of less is more. More is more. And more is better. You know, I want to address the issue about whether this was harmless. And, of course, I've kind of gotten into the identification already, so I won't repeat myself. But the prosecutor used this statement. I want to talk to the state's attorney about getting a deal as indicative that the defendant was, well, he's guilty. Because guilty people make deals. Innocent people don't talk about deals. I'm wondering about the subliminal effect of admitting this type of thing. Because Detective Berg testified at the trial that I totally defended that it wasn't going to happen. I'm not going to get the state's attorney. If I'm a juror and I'm listening to that, I'm saying, well, they don't want to talk about a deal because why? Because, as Detective Berg testified at the suppression hearing, they thought they had their guy. And so we would request Your Honor to reverse the conviction and remand the case for a new trial. Thank you. Okay. Good morning, Your Honors. Counsel. I'll address the first issue also. And as we have time, I'll get a little into the third issue or answer any questions on the second. In terms of what this was, this was not a preamble to any type of plea discussion. There was nothing. You have to look for some type of rudiments of the plea negotiation process. And to have that, you have to have some offer to plead guilty in exchange for some concession by the state. In this case, we have neither. Is the concept of I'm going to confess or I will confess tantamount to I will plead? There is a difference. I will say this. I don't believe there are any miracle words. I don't believe that it absolutely has to be I will plead guilty. But I do think that you have to look at all the circumstances and the words used to determine whether that's the intent when he says confess. But in this case, and I want to point this out, he never even uses the word confess to say he's willing to confess. What he says is, and let me find the language here, he talks originally and he says, do you want me to confess? They're showing him all the investigation they've done. They're showing him the surveillance photos. And he says, do you want me to confess? I've just gotten out of prison. In other words, he's confused by what they're even after at this point. He says that. He doesn't say I will confess. The next time he talks about confess, he says talk about what will happen if I confess. So and he says I would be looking at life if I confessed. So he's worried about this. Obviously, he's emoting and he's talking and he's saying these things which are independent admissions. He's worried about what he's facing. He looks at the photos. He recognizes himself, gets nervous. But at the same time, he never says even those words. He never even says I will confess, which in some cases they've determined that even is not enough because as in Rivera, the Supreme Court said, you know, what would a confession entail? And that, you know, they didn't even consider that to be enough under those circumstances. And that's what you always look to, the subjective expectation of the defendant. And in this case, he starts out by talking about, you know, first of all, do you want me to confess to this and that type of thing? You know, I just got done with my time. But he doesn't say anything about striking a deal, anything of that sort. Instead, in response to that, the detective makes it clear that's not what they're looking for either. The detective says you should cooperate with us. In other words, talk to us. Tell us what you know. But nothing to do with a plea agreement. When the detective said to him the state attorney isn't going to come, should anything come in while they were on their way to that plea negotiation? I mean, certainly he wanted to work a deal out with the state's attorney's office, correct? Well, a deal of what sort? I mean, a deal to plead guilty? That's certainly not clear. He never says he'll do that. And as I said, he never even says he'll confess to it. So what type of deal? Does he know something about the armed robbery? Did his twin brother commit the armed robbery? I don't know what he's going to say. And he has not expressed a subjective intent to actually enter into a plea of some sort. So then why should what he said, which we don't know where he was going or what he had in mind, why should that be admitted into evidence? Why should that not have been suppressed? Because at that point, he's making admissions that he knows something about the armed robbery, that he thinks he can exchange some information about this armed robbery and get some type of deal. Now, whether that is a concession of some sort in terms of a sentencing or something for him or whether that's a concession of some other nature entirely. In fact, it's a motion to suppress. Are you just drawing a distinction between perhaps a defendant who would say, okay, I will confess to this crime, this event, and I want a deal, versus, okay, talking about I'm arrested for this, but I have information about something else? Well, there is a touch of that here because of what he says at the motion to suppress, which is he says we weren't even talking about the armed violence. We were talking about some murders. Now, whether that's believable or not, and the court found that wasn't believable, he certainly is not expressing when he has a chance to that he has some subjective expectation here. So in a sense, he's even showing us after the fact that there was no subjective expectation for him in terms of this case. And I think that's an important circumstance. I don't think it's necessarily the only circumstance here. We don't have him making any sort of agreement on his behalf to plead to this crime, to want a concession to this crime in exchange for that. Instead, he's talking about he wants a cigarette, and if he gets a cigarette, he'll talk about this. Well, he gets a cigarette, so that clearly, that information clearly has nothing to do with a plea agreement. Then he gets to the state's attorney. And yes, you know what, from his words, I won't go so far as defense counsel did that, you know, from his prior, you know, his prior as we know that for sure he knew the state's attorney was in Thakkar. But his words seem to indicate that he's looking to the state's attorney and thinks that's who he wants to make a deal with. And that's probably who he thinks has the authority to make a deal. Well, he said, I'm going to go away for life. So he obviously wanted to make a deal. He says that, you know, that to the extent that he wants to get a guaranteed deal, he wants to talk with the state's attorney. But they say, no, that's not going to happen. And what does he do? He doesn't stop there. He can't possibly have a subjective expectation at that point that anything is happening towards this preamble, if you call it that. But I wouldn't call it a preamble. It's like a preamble to a preamble. He hasn't given anything that indicates that he's even going to plead guilty, that he's still sort of mowing this all over in his mind as to what he could possibly get out of this situation in some manner. So this isn't even a preamble to it. This is sort of like saying, what's out there? Oh, you know what, the person talks deals. So you're saying you can't even – in order to suppress this, you would have to talk a deal with an end game as opposed to just some plea negotiations with no end game? No, because there's no – I think, you know, you're putting in plea negotiations there. I don't think – I think that's what's missing even here. We don't even know he's talking about a plea. We don't even know he's talking about confession. We just know he has something that he'll talk about. It's very much like the Rivera case. In that case, they said – I believe he said something about, you know, I'll talk – you know, I'd like to talk to you about this. He doesn't ever use the words that would indicate anything other than a conversation, cooperation, to telling them some details about this that he could claim he knows through himself or somebody else that might be involved. None of it goes to the direction of pleading guilty to this crime. And he not only says it once and they say, no, the state's attorney is not coming, but then he again off the top of his head talks about wanting to make a deal with the state's attorney. And I suggest that that also goes to showing that these are all independent admissions. He doesn't stop talking even when he knows that there's – nope, there's no possibility, it's not going anywhere else. He still makes another statement. So what is this? This is him being loose, you know, with what he's concerned about, but those are independent admissions. Nothing to do with a preamble, nothing to do with can I have the state's attorney, I want to talk about pleading guilty. You know, can I have the state's attorney and I want to confess to this crime in exchange for getting a minimum sentence or something. Those might be taken differently. We have none of that here. Okay. I don't want to use up all your time on this issue, so I'm going to ask you to move on to the ineffective assistance of counsel. And the instruction issue? The instruction issue. Okay. You know what? As I said in my brief, defense counsel went through all these. And I realize that what defense is saying is that's still different, that there's no instruction on this. But what we do have is we have the defense counsel highlighting each one of the areas. Every single one of those areas was talked about by the defense attorney and rebutted to some degree by the state's attorney. So this is very much highlighted to the jurors that this is why, you know, these are the things either for or against whether this is a reliable identification. And I think under those circumstances, certainly it can't be more than harmless error. And, in fact, most of those considerations actually weigh in favor of the state. And I think that also is another reason why this can be nothing other than harmless error. What is the compensation for the imprimatur of that instruction coming from the court as opposed to coming from one or both counsel? Well, I don't think there's a difference. But I think that with the state not arguing against that being important, and they did not argue that those considerations were not important, that there is basically an implied agreement that these are the things you should be considering. If that's true, why do we give them instructions on anything? Well, I think, you know, I think sometimes that there are also this is not. You would agree that ID is the whole case here? I would agree that ID, yes, is very important, but not the whole case, because the defendant himself sees these pictures and begins to get the photographs of the surveillance photographs and noticeably changes his demeanor, noticeably changes to the officer. And then that's when he starts to talk about, you know, what's going on here and what do you want me to do and that type of thing. His wife, when they go to her, you know, to talk to her about, and I believe there's a search of the home, they talk to her. She's very calm to begin with. She knows he's been arrested for this crime, very calm about it. Then they start to show her the photos, and she immediately starts to shake and she starts to cry. She sees these pictures, and, yes, these pictures are not, you know, crystal clear by any means, but she also recognizes the defendant in these pictures and realizes this is going to be a hard case for him to win, as he does. He also makes a phone call to his wife and says, you know, I've got a cell phone there. You know, they were about to search. I've got a cell phone there that you need to get rid of. And when they go to search her place, there's no cell phone. You know, these are all incriminating facts, certainly inferential but circumstantial, but they, in addition to the ID, which was as certain as anything could be, he looked at 12 photos. The first lineup he was told to look at, and I think there's always a little bit of a sense, even when you're told there might not be anybody in here, you know, a certain sense of like, you know, but they wouldn't be giving these to me unless they thought there's a chance. You know, he's looking at these photos. He says, no, he's not in there, and he wasn't in there. Then they give him six more photos. Now he picks out one and only, and they ask him at trial, why did you pick that out? Because it was the robber, because he saw him, and he certainly did not ever say that he didn't see him closely. He was only a few feet away. He says he didn't make any effort to get up closer to see him. That's basically what the input of what he's saying is. He looked at him. He was very focused on him. He was scared. He knew what was going on. He had time to look at this person, especially when the other person, Sue Spores, I think, the manager was emptying the cash registers. You know, yes, he was nervous, but that also can direct your attention to what's going on. He was very close, and he was able to not only say that this person weighed 200 to 220, which he did, was about 5'9", which I believe he was 5'10", or I might have that reversed, but he also picked this person out of their lineup on facial photos only. So he was able to do, you know, give a good description of his body type, but he also was able to look at the photos and pick the correct person out of 12 photos. So you're saying it's harmless there? Well, certainly it would be harmless there if there's areas. Well, you know, they should have been instructed, but, yes, it's harmless there. When counsel for the defense cross-examined the witnesses, he did impeach them on their ability to identify, did he not? When counsel for the defense, yes, he did try to, yes, absolutely. You know, he went to how short a time they had, you know, whether they were focused on him, whether he was trying to hide his appearance, all those questions were asked. Oh, they couldn't identify him? Yes, yes, absolutely. And if I may, I just want to briefly touch on the Krankel issue and to say just that at this very preliminary stage, they're looking for possible neglect. The court can do that by any number of ways, and it wasn't just the state's participation in terms of the intoxication issue. The trial court asked defendant to explain his claim. So it was input from the defendant which led the judge to know that basically this issue was facially insufficient. I mean, this issue was not, you know, whether or not it was I was intoxicated at the time and my attorney didn't do enough given that it was the police officer's opinion that I was not intoxicated and they gave their experience and they gave why they had that opinion, that the attorney should have done something more because according to defendant, once the officers who are with me know I'm intoxicated, they have to then go further and have some type of process to figure out whether these statements are reliable. Well, that's facially insufficient because that's once they determine he's intoxicated. Well, they would be suppressed if that were the case. They said he was not intoxicated. How do you distinguish Jolly and, I mean, in the court here allowing the state to have a say in the proceedings? Well, because these were within, this is within the very narrow part where they say that there can be de minimis participation by the state and that it's not error. So we don't have to argue that it's harmless error here. You can have some participation. It shouldn't be much. It should be, as we said in the Fields case, and that I think is a good language, language that makes sense, the state can certainly answer questions that are concrete, easily verifiable. It cannot get into an adversarial position between the parties, and that's the important question here. And the answer to that is it did not because after the defendant was asked, explained his position, which, as I say, I think the court could have stopped right there and said this is facially insufficient, that's the end of it. But then the court did say to the state's attorney, do you want to comment? The state's attorney brings out only these facts, that this intoxication issue was addressed at a motion to suppress, that the defendant testified at that motion to suppress, and that there was a detective who the state called who said that he did not exhibit intoxication such that he could not talk to them and he seemed to be able to answer the questions, and he testified the same way at trial. All that could have been easily or is easily verifiable. It is exactly what happened on the record. The state never got into calling the defendant, asking, you know, or arguing against the defendant. It did not call the defense attorney as a witness of some sort. It did not argue in any way that the motion to suppress, you know, if we reconsidered it, here's some additional considerations. None of that was said. It was really very much, here's what the record would show you, basically. And that is what the record showed because, of course, the motion to suppress was denied on that grounds. What would make a difference between what the state recited in response to that question and them taking an adversarial position? What more could they have added? What more could the state have done? In argument, uh-huh. Well, if the state had, as I said, I think that the types of things we would be looking for is the state arguing against this and saying, you know, here's why, you know, even if we were to look at it now, the police officers were credible. They were credible because of X, Y, and Z. They said this and this is why you should uphold this. There's nothing more you could have done because, you know, let me call the defense attorney up now and I'm going to ask him some questions as to what he, you know, what he thought and what he did. That's the type of adversarial relationship that you see in all the other cases cited by the defense. And none of those were present here. I believe that this fits within the small portion where you can call the assistant state's attorney, have him answer a few questions, and still be in a non-adversarial position. And for that reason, we would ask this court to affirm the defendant's conviction. Thank you. Mr. Wilkinson. A couple of points on the first issue. Judging from what my opponent says, there's a possibility that the defendant's reference to a deal didn't involve this offense. It involved maybe information about unspecified murders or, you know, something else. Their own witness, Detective Bird, didn't interpret it that way because he said at the suppression hearing, he said, I didn't get the state's attorney because we thought we had our guy and they thought they had him on this offense. So in other words, he understood that proposed deal to involve something about this offense, the armed robbery of the gas station on April 29th, not some other issue. And I'm not even sure that the trial just decided this case by reference to the correct law because at a hearing on the post-trial motion, he said, and this is where the post-trial motion was denied, he said there was no one there who had authority to enter into plea negotiations. But that's not the law. Rule 402 doesn't require that. It never has. As a matter of fact, in the Freedman case, which I think was decided in 1980, that's 35 years ago, they note that the federal rule is different. This rule has never changed. The prosecutor doesn't have to be there. Unless there are any further questions, I have nothing else to say. Thank you very much. Okay. Thank you, both parties, for your arguments here today. We will take this case under consideration and render a decision in due course.